UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Jennifer Krizan, | Court File No. 17-cv-656 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| | **COMPLAINT** |
| Presto Absorbent Products, Inc., | |
| Defendant. | |

Plaintiff Jennifer Krizan, by her attorneys, Shannon Law, LLC, brings this action for damages and other legal and equitable relief resulting from Defendant Presto Absorbent Products, Inc.'s violations of law. Plaintiff states the following as her claims against Defendant:

## PARTIES

1. Plaintiff Jennifer Krizan is an individual living in Boyceville, Wisconsin.

2. Defendant Presto Absorbent Products, Inc. is a Wisconsin corporation with its principle office in Eau Claire, Wisconsin.

## JURISDICTION AND VENUE

3. Krizan's claims arise under Title VII of the Civil Rights Act of 1964, and the Consumer Products Safety Improvement Act, 15 U.S.C. § 2087. Jurisdiction for these claims is conferred upon this Court by 42 U.S.C. § 2000e-5; 15 U.S.C. § 2087; and 28 U.S.C. § 1331.

1

4. Venue is appropriate because the unlawful practices described hereinafter were committed in the Western District of Wisconsin and Defendant does business in Wisconsin.

## FACTUAL ALLEGATIONS

5. Plaintiff Jennifer Krizan began her employment with Defendant Presto Absorbent Products, Inc. ("PAPI"), a manufacturer of adult incontinence products, on June 1, 2015 as a Group Leader in Logistics. In that position, she oversaw the shipping and inventorying of PAPI's adult continence products, working a rotating schedule of day and night shifts.

6. Krizan's direct supervisor during her employment with PAPI was Logistics Manager Dean Jacobson ("Jacobson").

7. Krizan performed well in her position, doubling product output on her shift.

8. Throughout her employment, Krizan was treated differently than other male employees.

9. When Krizan first started working, Jacobson introduced her to Group Leader Jason Hurt, one of Jacobson's friends, stating Jacobson was "excited to have her with her background and experience." Hurt responded by looking Krizan up and down and commenting, "Yeah, I'm sure you hired her for her experience."

10. Jacobson frequently called Krizan during work hours to discuss personal and inappropriate matters, such as Krizan's love life, how long she had been living with her boyfriend, and why she was not married. Jacobson did not make such calls to male employees.

11. Jacobson often got angry if Krizan told him she needed to get off the phone to work. On one occasion, Krizan ended a phone call with Jacobson, stating that she needed to assist a driver. Immediately after the driver left, Jacobson called Krizan again and said that the "driver was gone" so she must have time to talk with him. Krizan inferred that Jacobson was somehow watching her in stalker fashion, even though he was not working.

12. Jacobson's conduct made Krizan uncomfortable and often interfered with her ability to do her job.

13. Other employees on Krizan's shift noticed Jacobson's frequent and lengthy calls to Krizan, and some commented to Krizan about them. When one employee, Group Leader Max Grabara, called Krizan, he often opened the call by saying, "What are you wearing?"—apparently to mock Jacobson.

14. Jacobson was at times physically threatening toward Krizan. On one occasion, he trapped Krizan in the narrow space between boxes on the manufacturing floor and brushed his hand up against her thigh and butt area when they were counting inventory. On another occasion, Jacobson asked Krizan to meet him in a remote part of the manufacturing floor, away from other employees. Jacobson's touching and overtures scared Krizan and she did what she could to avoid such circumstances.

15. Jacobson also had a sexual relationship with another female employee, Racin Knez, which interfered with Krizan's employment.

16. Because Knez was on the night shift, Krizan was at times her shift supervisor. Although Knez had several performance problems, Jacobson interfered with Krizan's handling of Knez's performance issues, instructing Krizan not to "harass" his girlfriend.

3

17. On one occasion in mid-July 2015, Jacobson expressly instructed Krizan to discipline another male employee for a joint mistake committed by both the male employee and Knez. When Krizan objected to the instruction and told him that Knez needed to be disciplined equally, Jacobson interrupted and said, "Absolutely not. She will not be disciplined." Jacobson then told Krizan that Jacobson's supervisor, Deb Creaser-Kipp, was "really pissed" for trying to get Knez in trouble, and that they needed "to figure out how" they would punish the male employee but not Knez.

18. In mid-July 2015, Krizan met with PAPI human resources manager, Teresa Ritzinger, and reported that Jacobson and Knez, by virtue of their relationship and Knez's performance problems, were interfering with her job and the morale on her team. Krizan informed Ritzinger Jacobson's conduct was disrupting operations on a daily basis and creating a hostile work environment. Krizan further informed Ritzinger that the problems had been going on for some time but employees had been afraid to come forward for fear of retaliation.

19. PAPI did not address Krizan's concerns after her mid-July 2015 meeting with Ritzinger.

20. On August 18, 2015, Krizan followed up with Ritzinger by email to again report concerns about Jacobson's discriminatory and retaliatory conduct. She wrote:

> I should not have to walk around on egg shells because if I catch her not working or doing things that I would normally talk to any other employee about, I am not supposed to say anything to her because of who she is dating. Or deal with the after affect [sic] that if I do, then I get brought into the office and Dean tells me that Deb is "extremely pissed at me for saying anything about Racin/her behavior." I have to be impartial in my position as a supervisor. He needs to be impartial as well in his position, but it seems we are having some obstacles with this.

4

>Frank actually said to me yesterday, "I am surprised you're still here…I'm happy you're still here, but I am surprised. No one else wants to put up with what's going on here." I said, "Well it's a bit of a challenge but I am not giving up yet." I was excited to be hired here and be part of a great team, but I need to be able to do my job without other people telling me I can't because it involves their girlfriend.

21. Ritzinger responded by instructing Krizan to address Knez's performance issues with Group Leader Jason Hurt. Krizan complied, informing Hurt that Knez was having issues complying with the company cell phone and break policies, and asking him to review those policies on his shift.

22. Krizan understands that Hurt reviewed the cell phone and break policies with his shift, including Knez, on August 22, 2015.

23. Later on August 22, 2015, Jacobson—who was not scheduled to work at the time—came into the logistics office where Krizan was working, and sat behind Krizan without saying anything to her. Krizan turned around, and Jacobson threw his hands to the side in a threatening manner and said, "So, you got a problem with someone on your shift, do ya?" Krizan started to respond that she did not, but Jacobson interrupted her, stating, "No? No problems with anyone, huh? Nothing that you think you should fill me in on or that you would want to tell me about?" Krizan said that she had reminded employees about the company cell phone and break policies. Jacobson responded, "That's it, huh?" Krizan confirmed that it was, and Jacobson stood up angrily, whipped the door open, and left the office.

24. On August 25, 2015, Krizan reported the interaction to Jacobson's supervisor, Deb Creaser-Kipp. Krizan also reiterated complaints relating to Jacobson that

she had raised previously with Rtizinger. Krizan informed Creaser-Kipp about the extended, personal phone calls that Jacobson made to her, as well as his inappropriate touching. Krizan further explained that Jacobson's conduct had caused employee morale and retention issues on her team. She said that employees frequently made comments such as "It's not who you know it's who you blow" and "Well we could do whatever we want if we were banging the boss too."

25. Creaser-Kipp told Krizan that she was angry that Jacobson was using his position as a tool to intimidate Krizan. She assured Krizan that Krizan was approaching the issues with Knez appropriately, and agreed that Jacobson was in the wrong.

26. On or about August 27, 2015, Krizan's coworker mentioned that Jacobson had a criminal record and a history of violence against women, and recommended that Krizan get an escort to her car to protect her from Jacobson.

27. After the comment, Krizan emailed Ritzinger asking for assurances that Jacobson did not have access to Krizan's home address.

28. On August 28, 2015, Jacobson's conduct had not improved and Krizan spoke with Ritzinger again, reporting that Jacobson was calling her frequently, getting into confined spaces with her, and watching her at work in a manner that made her uncomfortable. Krizan informed Ritzinger of the comment that a coworker had made to her about Jacobson's history toward women, and reported that Jacobson did not treat male employees in the same manner.

29. Ritzinger laughed and told Krizan not to look up Jacobson's criminal record. She then told Krizan, "**If it's a woman in your position, they're gonna have issues**."

30. Ritzinger then told Krizan to take care of Jacobson's conduct herself. When Krizan informed Ritzinger that she had tried and failed to address the conduct herself, Ritzinger responded that Krizan had to teach Jacobson how to act like a manager because he was new at managing. Krizan objected, and stated that she feared retaliation from Jacobson. Ritzinger responded that Krizan should take a couple days and figure out how to approach the problem again, commenting that she did not see what the "big deal" was.

31. On September 5, 2015, Krizan attempted again to escalate her concerns about Jacobson by emailing PAPI's President, Ricardo Borrero, and requesting a meeting with him. Borrerro replied that he was too busy and directed Krizan to contact the plant manager, Jeff Weyenberg.

32. On September 14, 2015, Krizan emailed Weyenberg requesting a meeting to discuss "some weird behaviors and issues" with Jacobson. Weyenberg, however, also refused to meet with Krizan, and directed her back to Ritzinger and Creaser-Kipp.

33. Krizan attempted to escape Jacobson by applying for a Business Analyst or similar office position, which would not have significant involvement with logistics. Although she was qualified, PAPI denied Krizan the position.

34. Despite Krizan's work environment, Krizan performed well and in early October 2015, received a performance review which rated her as meeting or exceeding expectations in nearly every category. For the performance category of taking responsibility and being self-motivated, Krizan received an "Exceeds Expectations" mark. Jacobson noted the "great improvement on the workload being completed". He also praised Krizan for improving employee morale and taking initiative as a manager.

7

35. However, when Jacobson met with Krizan to discuss the performance review, Jacobson focused on retaliating against Krizan. He opened the meeting by asking whether Krizan had "any issues" with him dating Knez, and focused on his and Knez's relationship for much of the meeting. Jacobson told Krizan that if she or anyone else spoke to Knez about her performance, he would consider it "harassment." He said that any issues relating to Knez had to go through him. Krizan objected, but Jacobson insisted that he was Knez's supervisor.

36. Although Krizan had been promised upon being hired that she would receive a $2,500 raise, PAPI did not give Krizan a raise.

37. When Krizan complained to Ritzinger about PAPI's refusal to give her a raise, Ritzinger told Krizan that she was ineligible because she had not worked at the company for 90 days. Krizan pointed out that she had in fact worked there for 90 days, at which point Ritzinger changed her explanation, stating that Krizan had not received the raise because she had not received sufficient computer training from Jacobson.

38. On or about October 21, 2015, Krizan met with Ritzinger to report her continued concerns about Jacobson. She informed Ritzinger that Jacobson apparently had learned about her complaints, despite PAPI's policy that they were to remain confidential, and was retaliating against her, acting aggressively and threatening that Krizan's supervising of Knez would be deemed harassment. Krizan explained Jacobson's threatening conduct during her performance review meeting, and asked Ritzinger how she should handle situations where Jacobson threatened her. Ritzinger told Krizan that she did not know what the solution was.

39. Around the same time, Krizan made similar reports to Creaser-Kipp.

40. Although PAPI apparently met with Jacobson to discuss his conduct in or around October 23, 2015, Jacobson's conduct did not improve. To the contrary, PAPI's own documentation reflects that in the October 23, 2015 meeting Jacobson announced his intention to retaliate against Krizan by bringing up Krizan's alleged past performance issues.

41. On or about January 9, 2016, Krizan discovered several cases of adult diapers that were damaged and contaminated. She ordered that the product be "scrapped" rather than shipped to consumers, and directed one of her employees, Terry, to remove the scrap from the warehouse.

42. Later on January 9, 2016, Krizan notified Jacobson by email, and carbon copied her colleague Max Grabara, that she had scrapped contaminated product. She wrote:

> Today I had an employee here on OT so I used him to help clean the warehouse by fixing boxes and removing scrap out to utility. He had a pallet sitting out there with some cases on it and it was brought to my attention that the judgement call on whether or not they should be scrapped was being questioned by another employee. I went out to utility and asked Terry to go with me to look them over. Terry agreed that they should be scrapped since the bags were ripped or had dirt inside them from being on the floor in the warehouse. So we baled the cases.
>
> Just thought I would mention it in case something gets brought up about the pallet of scrap tonight.

43. On January 9, 2016, Jacobson replied, adding Deb Creaser-Kipp as a recipient. He wrote:

> I am not entirely sure what this is all about but would like to know.
> Were the scrap cases part of a QCHold disposition, were they removed from inventory? How many cases are we talking?

9

> If we are talking about a considerable amount I don't think that Terry is the correct person to be making that call, it may have been better to sell as seconds.
>
> Max,
> If there are a lot of cases at the baler that are not part of a QCHold pull them from there.

44. Grabara responded, stating that the cases in question "were the result of damages in the warehouse where cases and the bags were ripped open and contaminated with dirt or dust." He informed Jacobson that Krizan could answer any additional questions about the cases, and that he believed that the cases had already been baled.

45. Krizan then replied on January 13, 2016, reiterating that

> . . . they were cases that had ripped open bags. I believe it was approximately 8 cases that I scrapped out of inventory. Some of the cases were ripped completely open and the bags damaged inside looking like a clamp dug through them. Then there were a couple that were just ripped open with ripped bags in them. (Some appeared ripped, some looked like a knife had went through them). When I looked through them, there were not enough "good" bags to make a new case and I wasn't going to send open bags with dirt on the pads to a customer so they were scrapped. The only reason I emailed out any of this in the first place is because one of my employees said that there was someone else asking why we were not shipping the cases.

46. Jacobson responded the same day:

> Ok. Please read the email I sent and help me understand by answering the questions I had and let me know that you understand what I stated.
>
> Attached is a negative inventory report that notes finish goods scrapped out of RM30. This has been corrected now.
>
> There were 7 cases of the 56663 that were scrapped, were these part of this? You are saying that out of the 28 bags everyone was torn or dirty?

47. Krizan again replied to Jacobson on January 13, 2016:

10

> The scrap cases came from the warehouse when cases were being repacked and cleaned up. What we were finding in a lot of the cases was that the bags were literally sliced open. Almost as if a knife had been taken to them. I was not going to ship these to the customer. These could be the number you gave of 56663, but off the top of my head I can't be 100%. I brought it up in the production meeting today so they are aware of it also and Theresa said we did the right thing to scrap them and that if we see that issue again and we want extra confirmation that we can always bring them back to her first.

48. Later on January 13, 2016, Jacobson confronted Krizan in her office about the scrapped product. Jacobson asked for an explanation about why so much product had been scrapped. Krizan explained that she had scrapped the product because it was contaminated. When Jacobson continued to press the issue, Krizan informed Jacobson that both the production manager and the quality control manager had agreed with her decision. Jacobson angrily told Krizan that she should not have contacted the production and quality control managers about the issue, and instructed her to ship it anyway. Krizan refused, stating that she would not be responsible for shipping contaminated product.

49. On the next day, January 14, 2016, Jacobson issued Krizan a performance improvement plan ("PIP"). The PIP contained three categories: (1) "Paperwork handling and electronic transactions" with a "required improvement" of self-assessing her understanding of the AS400 system and getting proper training to fill in areas she did not understand; (2) "Following and understanding direction-Communication" with required improvements of "Training/coaching of employees" and "Improved crossover meetings"; and (3) "Leadership – Employee behavior" with the required improvement of "Self-assessment of what you see as issues on your shift towards non-productive behaviors." The

11

PIP required the company to review and coach Krizan on these areas after one week, two weeks, 30 days, 45 days, and 60 days.

50. On January 18, 2016, Krizan emailed corporate human resources manager, Darcy Holman, requesting to meet with her about things that had previously "been swept under the rug" by management and human resources. Holman wrote back and scheduled a meeting with Krizan for the afternoon of January 19th.

51. On January 18, 2016, at Jacobson's request, Krizan provided her PIP Tracker document with her proposals for the "What you will do differently" portion. For category (1) regarding AS400 self-assessment, Krizan wrote that she had not received adequate training and would continue to request assistance when she came across something she was unable to do. For category (2), regarding following and understanding direction, Krizan wrote that her direction to that point had been virtually nonexistent to date and that she had mostly been self-taught or sought help from employees other than Jacobson. For category (3), regarding leadership-employee behavior and retention, she wrote that she had not seen any evidence that she suffered in this area, noting that Jacobson himself had praised her for her progress in that area.

52. Jacobson and Krizan met to discuss the PIP Tracker on January 18, 2016. During the meeting, Jacobson told her that her proposals in the PIP Tracker document were not acceptable and needed to be changed. Krizan refused, stating they were accurate, which appeared to anger Jacobson. Jacobson instructed Krizan not to tell anyone about the PIP.

53. On the morning of January 19, 2016, a meeting was scheduled between Krizan and Jacobson to discuss the PIP again. When Krizan arrived, however, Jacobson

took her to Ritzinger's office. Jacobson opened the meeting by telling Krizan that he had explained the day before "what he was looking for" on the PIP and that she had failed to agree to it. Krizan responded that she was satisfied with her responses on the PIP and that she would not agree to change her answers to lies. Ritzinger continued to press Krizan to adopt Jacobson's allegations in the PIP, but Krizan stood firm.

54. Ritzinger told Krizan that Krizan's refusal meant that she was quitting her job, and then stated that it did not look like "things fit." Krizan agreed that things had not fit because she had been harassed, retaliated against, and treated unfairly. Ritzinger said that she considered those issues "resolved," even if Krizan considered them unresolved. She said that she believed there were too many things that Krizan was "very unhappy" about at work and unwilling to work with them on. Krizan asked how Ritzinger would feel if her concerns were constantly being swept under the rug. Ritzinger repeated that the issues were resolved in her eyes, and told Krizan that she did not believe that Krizan's "heart" was "in it." Krizan responded that her heart was in it but that it was getting harder and harder to come to work. Ritzinger accused her again of not wanting to work at PAPI because she failed to agree to Jacobson's PIP language. Krizan again rejected the characterization, stating that no, she was simply refusing to lie; she did not want to quit.

55. After they went back and forth several more times on this issue, Ritzinger ordered Krizan to go home for the day so they could figure things out, and told Krizan to expect a call from her later. Ritzinger instructed Krizan to take her personal items and badge just in case she would not be returning, and Krizan was then escorted out of the building.

13

56. Four hours later, Ritzinger called Krizan and told her not to return to work. Krizan asked whether she was being fired, and Ritzinger told her that the company considered her to have quit.

57. Krizan filed a timely charge of discrimination against PAPI with the Wisconsin Department of Workforce Development's Equal Rights Division, and cross-filed it with the Equal Employment Opportunity Commission ("EEOC"), for violations of the Wisconsin Fair Employment Act and Title VII. The Equal Rights Division issued a finding that there was reasonable cause to believe that discrimination had occurred.

58. Krizan also filed a timely complaint against PAPI with the Department of Labor – Occupational Safety and Health Administration for violations of the Consumer Products Safety Improvement Act, which was later dismissed.

59. In a July 14, 2017 letter, the EEOC issued Krizan a notice of right to sue for her claims under Title VII.

## CAUSES OF ACTION

## COUNT I

### RETALIATION
### TITLE VII OF THE CIVIL RIGHTS ACT

60. Krizan incorporates the previous paragraphs of this Complaint by reference.

61. Title VII of the Civil Rights Act ("Title VII") provides that it is an unlawful employment practice for an employer to discriminate against its employees or applicants because she "has opposed any practice made an unlawful employment practice by [Title

VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3.

62. Krizan engaged in protected activity under Title VII.

63. PAPI's actions described herein violate 42 U.S.C. § 2000e-3.

64. PAPI's conduct described herein constitutes an intentional, willful, and reckless disregard for Krizan's rights.

65. As a direct result of PAPI's unlawful conduct, Krizan has suffered and will continue to suffer loss of income and employee benefits, mental anguish, emotional distress, embarrassment, and other damages.

## COUNT II

### DISCRIMINATION
### TITLE VII OF THE CIVIL RIGHTS ACT

66. Krizan incorporates the previous paragraphs of this Complaint by reference.

67. Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex". 42 U.SC. § 2000e-2.

68. PAPI is an employer for purposes of Title VII.

69. Krizan's sex was a motivating factor in PAPI's conduct described herein, in violation of 42 U.SC. § 2000e-2.

70. PAPI's conduct described herein constitutes an intentional, willful, and reckless disregard for Krizan's rights.

71. As a direct result of PAPI's unlawful conduct, Krizan has suffered and will continue to suffer loss of income and employee benefits, mental anguish, emotional distress, embarrassment, and other damages.

## **COUNT III**

### **VIOLATIONS OF THE CONSUMER PRODUCTS SAFETY IMPROVEMENT ACT, 15 U.S.C. § 2087**

72. Krizan incorporates the previous paragraphs of this Complaint by reference.

73. The Consumer Product Safety Improvement Act provides:

No manufacturer, private labeler, distributor, or retailer, may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee) -

(1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this Act or any other Act enforced by the Commission, or any order, rule, regulation, standard, or ban under any such Acts;

(2) testified or is about to testify in a proceeding concerning such violation;

(3) assisted or participated or is about to assist or participate in such a proceeding; or

(4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this Act or any other Act enforced by the Commission, or any order, rule, regulation, standard, or ban under any such Acts.

15 U.S.C. § 2087.

74. PAPI is a manufacturer and/or distributor within the meaning of the CPSIA.

75. Krizan engaged in protected activity under the CPSIA.

76. PAPI violated the CPSIA by discharging and otherwise discriminating against Krizan for her protected activity.

77. As a direct result of PAPI's violations of the CPSIA, Krizan suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Krizan prays for judgment against Defendant Presto Absorbent Products, Inc. as follows:

1. For all relief available for PAPI's violations of the CPSIA, including, but not limited to, damages for past and future lost wages and benefits, compensatory damages, punitive damages, emotional distress and mental anguish damages, attorneys' fees and costs, and interest;

2. For all relief available for PAPI's violations of Title VII including, but not limited to, damages for past and future lost wages and benefits, compensatory damages, punitive damages, emotional distress and mental anguish damages, attorneys' fees and costs, and interest;

3. For all available equitable and injunctive relief;

4. For an award of Plaintiff's attorneys' fees, costs and disbursements; and

5. For such further and other relief as the Court deems just.

Respectfully submitted,

SHANNON LAW, LLC

Dated: August 23, 2017     *s/Bonnie Smith*
Adrianna H. Shannon (#0387799)
ashannon@shannonlawllc.com
Bonnie M. Smith (#0391915)
bsmith@shannonlawllc.com
333 South Seventh Street, Suite 2830
Minneapolis, MN 55402
Telephone: (952) 679-8868

Facsimile: (952) 241-9201

Counsel for Plaintiff Jennifer Krizan